Filed 8/10/15  N.E. v. Superior Court CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| N.E.,<br><br>              Petitioner,<br><br>     v.<br><br>THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES,<br><br>              Respondent.<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>              Real Party in Interest. | B263246<br><br>(Super. Ct. No. CK96800) |

Writ petition to review order setting hearing under Welfare and Institutions Code section 366.26.  Emma Castro, Juvenile Court Referee.  Petition granted.

Law Office of Timothy Martella and Rebecca Harkness for Petitioner.

No appearance for Respondent.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Melinda A. Green, Deputy County Counsel for Real Party in Interest Los Angeles County Department of Children and Family Services.

_____

Petitioner N.E. (Mother) seeks extraordinary relief (Welf. & Inst. Code, § 366.26, subd. (*l*);[1] Cal. Rules of Court, rule 8.452) from the juvenile court's order, made after she had received reunification services for the maximum allowable time, setting a hearing pursuant to section 366.26 to consider termination of parental rights and implementation of a permanent plan for her 15-year-old son E.E. We grant the petition and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 26, 2012, when E.E. was 13 years old, the Los Angeles County Department of Children and Family Services (Department) received a referral alleging Mother was hospitalized because she was hearing voices and threatening to harm herself. The referral also stated that Mother had recently cut her wrist, had physical fights with K.E. (Father), her husband and the father of E.E. and five-year-old J.E.,[2] and threw knives and forks at Father.

E.E. told the Department's social worker that, a week earlier, Mother had told him to "get [Father] because it's all driving me crazy," and that she "might slit you and your brother's necks." E.E. stated that Mother proceeded to act erratically, accused him of lying, and backed him up against a wall and began to choke him. E.E., who had a red mark on his neck from Mother's hand, ran to a neighbor's house to call Father. J.E. told the social worker that Mother often spoke to the television set because she believed there were people inside, and she regularly engaged in other odd behavior. J.E. stated that he did not feel safe with Mother.

Mother told the social worker she cut her wrist to ease her pain from pancreatitis. Mother denied having any mental issues, but stated she felt overwhelmed with caring for her children, especially as Father would leave the home for days and provided little financial support.

---

[1]     Statutory references are to this code unless otherwise indicated.

[2]     J.E. is not a party in this proceeding.

On December 5, 2012 the Department filed a petition under section 300 to declare E.E. and J.E. court dependents. The petition alleged the children were at risk due to Mother's mental and emotional problems, her physical abuse of E.E., and the domestic violence between Mother and Father. The court ordered the children detained in the home of their paternal grandmother.

In its report for the jurisdiction and disposition hearing, set for January 17, 2013, the Department indicated Father and the children confirmed that Mother engaged in bizarre behavior, and added that police were often summoned to the home when Father and Mother had physical altercations. Records from Mother's most recent hospitalization reflected a diagnosis of major depressive disorder and alcohol dependence. In a Last Minute Information report submitted on July 17, 2013 the Department reported that, after the children were removed from her care, Mother had visited them just once, on Christmas; she continued to display bizarre behavior including seeing famous people at Walmart, blaming E.E. for her hospitalization, and threatening to take the children in the middle of the night. E.E. told the social worker that he feared for his and J.E.'s life on the day Mother choked him, and he did not want to see or speak with Mother "when she's like this". A report by a Multidisciplinary Assessment Team stated that E.E. did not want to return to the family home due to "too many bad memories", and that he showed evidence of avoidance (avoiding places and people who remind him of a stressful event) and numbing (not having feelings about the stressful event), and was in need of mental health services to help him cope with the trauma he was suffering.

On January 17, 2013 the juvenile court ordered visitation for Mother with the children monitored by a monitor approved by the Department, and continued the matter to March 1, 2013 for a contested adjudication hearing.

On March 1, 2013 the Department filed an amended section 300 petition adding an allegation that Mother had a history of substance abuse and had tested positive for amphetamines and methamphetamines on January 26, 2013. Mother, who had again been hospitalized for exhibiting suicidal ideation and threatening to harm herself by jumping in front of a car, did not appear for the adjudication hearing. The court ordered

the Department to refer E.E. and J.E. to trauma-focused cognitive behavioral therapy and continued the adjudication hearing to April 11, 2013. In a Last Minute Information report submitted on April 11, 2013, the Department reported that E.E. and J.E. were receiving weekly trauma-focused cognitive behavioral therapy. Mother was visiting with J.E. on a regular basis, but E.E. refused to visit with Mother. On April 11, 2013 the court granted discretion to the Department to liberalize Mother's visits and continued the adjudication hearing to June 17, 2013.

In a supplemental report for the adjudication hearing the Department stated Mother was seeing a psychiatrist every other week and residing in housing for the homeless. Mother continued to visit with J.E. but not with E.E.

On July 16, 2013, following several additional continuances of the adjudication hearing, an agreement was reached in mediation. Mother submitted on an amended petition and agreed to dispositional orders granting her reunification services and monitored visitation with the children. As to E.E., the visits were to take place in a therapeutic setting. On July 18, 2013 the juvenile court incorporated the mediation agreement into an order and continued the matter to January 16, 2014 for the six-month review hearing. (§ 366.21, subd. (e).)

In its report for the six-month review hearing the Department stated that, although the children were happy, healthy and well cared for in the paternal grandmother's home, it had concerns about their emotional stability. In particular, E.E. continued to refuse to visit with Mother and, although the social worker encouraged visitation, E.E.'s therapist insisted that E.E. was not prepared even to see Mother and recommended that E.E. continue to receive therapy without Mother's involvement. E.E. was diagnosed with post-traumatic stress disorder, and stated that he had no interest in living with his parents and wanted to remain with the paternal grandmother. E.E. was in the ninth grade, doing well in honors classes, and hoped to become a doctor. On January 16, 2014 the court continued the matter to March 28, 2014 for a contested six-month review hearing.

In a report for the contested hearing the Department indicated E.E. continued to inform the social worker and the paternal grandmother that he did not want to visit with

4

Mother or participate in therapy with her. E.E.'s therapist continued to believe that, given his precarious emotional and psychological condition, it was not in E.E.'s best interest to have therapy or visits with Mother. The Department's social worker recommended that E.E. begin conjoint therapy with Mother once the therapist deemed it appropriate.

On March 28, 2014 the court continued the matter to June 25, 2014 and ordered the Department to prepare a supplemental report. In the report, the Department stated E.E. continued to insist that he had no interest in returning to Mother's home or visiting with her. E.E.'s therapist again stated that it would not be therapeutically appropriate for E.E. to visit with Mother or to begin therapy with her. The therapist recommended that Mother undergo a psychological evaluation. (Evid. Code, § 730.)

The court conducted the six-month review hearing on June 25, 2014. Mother and Father withdrew their contest. The court ordered J.E. placed with Father, from whom Mother had separated, under the Department's supervision, and ordered Mother's visits with E.E. to "remain in a therapeutic setting if the therapist deems appropriate." The court ordered conjoint therapy for Mother and E.E. when deemed appropriate by the therapist. The court found the Department had provided reasonable reunification services, appointed Suzanne Dupee, M.D., to conduct the psychological evaluation of Mother, and set the 12-month review hearing (§ 366.21, subd. (f)) for December 18, 2014.

In its report for the 12-month review hearing the Department stated that E.E. continued to excel in school and was happy in his placement with the paternal grandmother. E.E. told the social worker, his therapist, his attorney and his grandmother that he had no interest in reunifying with Mother, and he refused to participate in visitation or in therapy with Mother. In view of E.E.'s refusal to participate in therapy with Mother and his great anxiety about visiting her, E.E.'s therapists determined that therapy for E.E. was not currently clinically appropriate and discontinued therapy services for him. Mother was in compliance with her case plan, but the Department was

concerned that she had not fully acknowledged or taken responsibility for her physical attack on E.E. and was in denial about her precarious mental health condition.

The Department further reported that the director of Ties for Families, which had been providing therapy services for E.E. until they were terminated on July 30, 2014, told the social worker that E.E. displayed trauma and anxiety whenever he was faced with the prospect of having any discussions with Mother, and under these circumstances it would not be appropriate to force E.E. to participate in services with Mother. When the social worker met with E.E. on October 10, 2014 to discuss the possibility of resuming therapy, E.E. explained that he did not want even to see Mother and stated angrily, "If I have to meet with my mom in order for the child services to be out of my life, I'll do it," adding that unless he were forced to continue with services, he did not intend to comply and he had no interest in having any relationship with Mother. Mother sent a letter to E.E. explaining that she missed him and hoped to visit with him, but E.E. refused even to look at the letter, and instead had his grandmother read it to him. E.E. was angered by the letter and did not reply.

With its report, the Department submitted Dr. Dupee's psychiatric evaluation of Mother. Dr. Dupee stated that Mother had been psychiatrically hospitalized six times since November of 2012 and was taking multiple medications to address her problems with depression, anxiety and psychosis. Dr. Dupee observed that, during her interview, Mother displayed significant psychomotor retardation or slowing of her movements, walked very slowly, sat almost like a statue, had a delayed response in her speech, and showed evidence of depression and anxiety. Dr. Dupee had interviewed two of Mother's therapists. One of them believed Mother could be able to parent her children despite her mental illness. The second therapist disagreed, and expressed concerns about Mother's ability to parent effectively given her slow cognition and movement. Dr. Dupee diagnosed Mother as suffering from chronic schizophrenia, as reflected by her various paranoid delusions and suicidal events, and expressed concern that Mother would be physically and emotionally abusive to her children. Dr. Dupee concluded Mother was not fit to parent the children on a full-time basis and, although therapeutic monitored

6

visits with E.E. would be beneficial, it was not surprising that E.E. refused to see or visit with Mother at all. The Department recommended the court terminate reunification services for Mother as to E.E.

On December 18, 2014 the court terminated jurisdiction over J.E. with a family court order, set the 12-month hearing as to E.E. for a contest for March 12, 2015, and ordered the Department to prepare a supplemental report.

In a Last Minute Information report submitted on March 12, 2015 the Department explained that the social worker had met with E.E. on several occasions to discuss visitation with Mother, but E.E. remained adamant in refusing any visits. E.E. told the social worker that he had no interest in visiting or participating in therapeutic services with Mother, was not interested in seeing Mother in the foreseeable future, and wanted to continue to live with his grandmother. The Department recommended the court terminate reunification for Mother as to E.E. and set a hearing pursuant to section 366.26.

No testimony was taken at the contested 12-month review hearing on March 12, 2015. After the court admitted into evidence the Department's reports and Dr. Dupee's psychological evaluation of Mother, counsel for the Department requested that the court terminate reunification services for Mother as to E.E. Counsel for E.E. joined in the Department's request, observing that Mother clearly suffered from serious mental illness, E.E. did not feel safe with Mother, and Dr. Dupee had concluded Mother was not fit to parent E.E. and might be physically and emotionally abusive to E.E. if he were returned to her care.

Counsel for Mother requested that the court order E.E.'s return to Mother's care, or in the alternative order an extension of reunification services, urging that her right to reunification had been thwarted by allowing E.E. to veto any visitation with her.

The court terminated reunification services for Mother. Initially, the court observed that because 25 months had elapsed from the date E.E. was removed from Mother's care, the case had exceeded the 18-month statutory limit for reunification and further reunification services could not be offered to Mother. The court then found that the return of E.E. to Mother would be detrimental to E.E., observing that E.E. sustained

7

severe trauma when Mother suffered a psychotic breakdown and attacked him physically. As a result of this trauma, E.E. developed an overwhelming fear for his safety and well-being in Mother's presence and consistently refused to visit or participate in therapy with Mother. The court further observed that Dr. Dupee expressed serious concerns that Mother would be physically and emotionally abusive to E.E. and was not a fit parent for E.E. The court then set the matter for a hearing pursuant to section 366.26.

## CONTENTION

Mother principally contends the juvenile court violated the separation of powers doctrine by abdicating its responsibility to determine whether any visitation between Mother and E.E. would occur, and delegating the responsibility to E.E.'s therapists.

## DISCUSSION

1. *The Juvenile Court's Visitation Order Is an Invalid Delegation of Judicial Authority*

Visitation is a necessary and integral component of any reunification plan. (§ 362.1, subd. (a)(1)(A); *In re S.H.* (2003) 111 Cal.App.4th 310, 317 *(S.H.)*; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1489.) "An obvious prerequisite to family reunification is regular visits between the noncustodial parent . . . and the dependent [child] 'as frequent[ly] as possible, consistent with the well-being of the [child].'" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49-50 (*Julie M.*).) Although the Department's social worker may be given responsibility to manage the details of the visits, and the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation (*Julie M., supra,* 69 Cal.App.4th at pp. 50-51), "the power to decide whether *any* visitation occurs belongs to the court alone. (Citation.)" (*S.H., supra*, 111 Cal.App.4th at p. 317.) The court may not delegate this power to a third party, whether social worker, therapist or the child and, if it does, the court violates the separation of powers doctrine. (*S.H., supra,* 111 Cal.App.4th at pp. 317-318; *Julie M., supra,* 69 Cal.App.4th at p. 51.)

8

Although here the court did not issue an order expressly making visitation contingent on E.E.'s consent or on the approval of his therapist, its visitation order made at the six-month review hearing was inadequate under the circumstances of the case. In three separate reports for the hearing the Department indicated that, in view of E.E.'s refusal to visit with Mother and his therapist's recommendation that visits not take place, visits between E.E. and Mother were not occurring at all.[3] Under these circumstances, the court's visitation order essentially granted E.E., the therapist, and the social worker authority to determine whether any visit would occur, in derogation of the court's responsibility to regulate visitation between E.E. and Mother. The court failed to ensure that at least some visitation would in fact occur or to describe the frequency and duration of visits. Nor did the court give the parties any guidance about the circumstances under which visitation would be permitted, how the determinations whether to allow visits were to be made, and who was to be involved in making those decisions. While the court ordered visitation for Mother, it did not provide any real assurance that visitation would occur.[4] As a result, Mother's right to visitation was illusory. (See *S.H.*, *supra*, 111 Cal.App.4th at p. 319.)[5]

---

[3] As noted earlier, the only visit took place in December of 2012, just weeks after the section 300 petition was filed and six months before the petition was sustained in July of 2013.

[4] We note that, although the juvenile court had the option to issue a "no visitation" order upon a determination that visitation would jeopardize E.E.'s safety (§ 362.1, subd. (a)(1)(B)), it did not exercise that option.

[5] Because we grant relief to Mother on this ground, we do not address her additional contentions.

9

2. *Mother Is Entitled to Additional Reunification Services Beyond the 18-Month Statutory Limit*

As we have observed, 25 months had elapsed from the time E.E. was removed from Mother's care when the juvenile court conducted the 12-month review hearing, exceeding the 18-month statutory limit for reunification. (§§ 361.5, subd. (a)(3), par. 3, 366.22.) Under these circumstances, reunification services may continue only when exceptional circumstances exist, involving some external factor that thwarted the parent's efforts at reunification. (See, e.g., *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777-1778; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1209, 1212-1214.) Those circumstances are present in this case. Courts have long recognized that, in the context of dependency proceedings, a lack of visitation may "virtually assure [ ] the erosion (and termination) of any meaningful relationship" between parent and child. (*In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407.) As we observed in *In re C.C.* (2009) 172 Cal.App.4th 1481, "Without visitation of some sort, it is virtually impossible for a parent to achieve reunification." (*Id.* at p. 1491.) We thus find exceptional circumstances warranting extension of reunification services beyond the statutory limit.

## DISPOSITION

The petition is granted. The matter is remanded to the juvenile court, which is directed to proceed as follows: The court shall vacate its order of March 12, 2015 terminating reunification services for Mother and setting the case for a hearing pursuant to section 366.26; make a new order extending reunification services for Mother for an additional six months; conduct a new hearing on the issue of visitation; and fashion an appropriate visitation order. The order shall provide for a minimum number of visits per month to be administered by the Department and mental health professionals working with it. In the event a period of one month elapses without any visit (either because E.E. refuses to attend a particular visit, or his therapist opines that E.E. will suffer adverse consequences if a visit is forced on him, or for any other reason), the order shall require the Department to report the matter to the juvenile court. The report shall advise the court of the reasons the visitation had not occurred, including but not limited to E.E.'s

wishes and his therapist's opinion regarding adverse consequences if a visit were forced against E.E.'s will.  (See *S.H.*, *supra*, 111 Cal.App.4th at pp. 319-320; *In re Julie M.*, *supra*, 69 Cal.App.4th 41, 51.)  The court may then reconsider its order in response to the existing situation.[6]

This decision shall become final as to this court within 10 days after filing.  (Cal. Rules of Court, rule 8.490 (b)(2)(A).)

ZELON, J.

We concur:

PERLUSS, P J.

SEGAL, J.

---

[6]    The court takes judicial notice of the juvenile court's order of July 9, 2015 selecting and implementing a permanent plan for E.E.  The juvenile court is ordered to vacate its July 9, 2015 order.

11